J-A13022-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| CARMINE BLOISE, JR. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CHRISTINA DADEY | : | No. 1582 WDA 2024 |

Appeal from the Order Entered November 20, 2024
In the Court of Common Pleas of Allegheny County Civil Division at
No(s):  Case No. FD-22-001447-007

BEFORE:  BOWES, J., OLSON, J., and BENDER, P.J.E.

MEMORANDUM BY OLSON, J.:  **FILED: July 3, 2025**

Appellant, Carmine Bloise, Jr. ("Father"), appeals *pro se* from the child custody order entered on November 20, 2024.  We affirm.

Christina Dadey ("Mother") and Father are the parents of A.B. ("Child"), who was born in March 2019.[1]   On June 8, 2023, Father filed the initial complaint in this child custody action, where he sought shared physical and legal custody of Child.  Child Custody Complaint, 6/8/23, at 1-4.  The complaint was served on Mother and, on June 22, 2023, counsel entered their appearance on Mother's behalf.  **See** *Praecipe* for Appearance, 6/22/23, at 1.

Following service of the complaint, the trial court entered several interim custody orders in the matter, declaring that:  the parties shared legal custody of Child, Mother had primary physical custody of Child, and Father had partial

---

[1] Child was born out of wedlock.

physical custody of Child. **See** Trial Court Order, 6/27/23, at 1-2; Trial Court Order, 9/14/23, at 1; Interim Consent Order, 12/28/23, at 1-4; Trial Court Order, 3/26/24, at 1.

By order entered October 7, 2024, the trial court scheduled a custody hearing for November 20, 2024. Trial Court Order, 10/7/24, at 1.

On November 12, 2024, Father filed a "Motion to Withdraw Case Without Prejudice," where he sought trial court permission to withdraw his child custody action without prejudice. Father's Motion to Withdraw, 11/12/24, at 1-4. Further, on the day of the hearing, Father filed a "*Praecipe* to Discontinue" the child custody action. Father's *Praecipe* to Discontinue, 11/20/24, at 1-2. The trial court did not grant Father's motion and did not grant Father leave to discontinue the action. **See** Pa.R.C.P. 1915.3-1(b)(2) ("[a] custody action cannot be discontinued after the complaint has been served except (A) by leave of court after notice to the non-moving party, or (B) by written agreement of the parties").

The trial court held the custody hearing on the scheduled date of November 20, 2024. Father did not, however, appear for this hearing.

During the hearing, Mother testified that she is a middle school English teacher and Father is "self-employed as an independent contractor working on projects and directing and editing videos." N.T. Hearing, 11/20/24, at 8. Mother agreed that the following recitation of the facts as set forth on the record by Mother's counsel was a correct summary of her testimony:

The parties met in January of 2018. Mother became pregnant. Subsequently the parties began living with one another in August of 2019 where they also share[d] their residence with [J.B.], [Father's] other daughter from a prior relationship. [J.B. is now eight years old].

The longer that [Mother] was living with [Father,] she began noticing emotionally abusive behavior, including controlling, erratic and unstable actions. Unfortunately this did escalate to physical abuse which included pushing, shoving, choking, scratching, refusing to let her leave the residence without his permission and the like. Despite this abuse [Mother] did try to work with [Father] and go through couple's therapy.

On July 29, 2022, after a very intense argument with [Father], it resulted in him choking and shoving [Mother]. And at that point in time she realized that she needed to end the relationship. Following this argument[, Mother] went to a family vacation with both [Child] and her half-sister [J.B.]. Mother and [Father] had agreed [Father] was to move out of the residence when [Mother] had returned from vacation. On August 6, 2022[, Mother] did return from the vacation with both children.

. . .

Now, so [Mother] eventually did drive to the residence following this vacation to see if [Father] had moved out. Initially she believed him to have been gone, but he was actually hiding down the block in his car. When she approached the residence, [Father] did open the door, grab [Mother, and] forcibly pulled her inside. There was an immediate struggle. Father grabbed [Mother's] cell phone from her hand to prevent her from calling for help. She was stuck in there with him for approximately three hours as he was trying to or as he was threatening to kill himself and also threatened [Mother] with violence, which he ultimately followed through with when she tried leaving the residence. At that point he did push her to the bed and with a closed-fisted hand, punched her in the head. Eventually [Father] did give [Mother] her phone back and she was able to leave the residence.

- 3 -

Mother did have to seek urgent medical attention at Med Express after being hit by [Father] a number of times, ending in that closed-fisted punch, and she was diagnosed with a left ruptured eardrum, and [Father] also admitted to this incident, in hitting [Mother], in his psychosocial report as well.

. . .

So on August 8, 2022[, Mother] did file a PFA, Protection from Abuse [petition]. A Temporary PFA Order was entered the same day evicting [Father] from the residence and awarding [Mother] primary physical custody of [Child] subject to [Father's] supervised partial custody – physical custody. A Final Order was later entered on August 18 by consent of the parties granting [Father] partial physical custody of [Child] once he obtained his own residence. It was explicitly clear that he was not supposed to contact [Mother] directly or indirectly, not abuse, stalk, harass or attempt to threaten physical force against her.

For approximately seven months following this PFA [Mother] primarily took care of both [Child and J.B.], whom she has no legal rights or custody over. That was from August of 2022 through March of 2023. Over that seven-month period [Father] left both children with [Mother], and over that period of time [Mother] alleges he only visited approximately five times over that seven-month period for both of his children.

Father later violated that PFA Order for the first time causing an [indirect criminal contempt ("ICC")] complaint to be filed on October 22, 2022. It was during a custody exchange. Father argued with [Mother], forcibly pushed himself past her to enter the residence and began video-recording her, refusing to leave. . . . I should specify during that incident he did not leave for two hours and left after he was ready to do so.

On November 2, 2022, a general continuance order was entered extending the Final PFA Order until August 8, 2025. Father was provided with partial custody of [Child] every other weekend at that time.

Father violated the PFA for a second time prompting an ICC complaint on April 17, 2023 where he was essentially stalking [Mother] and outside of [Mother's] residence knocking on the door, repeating, ["Answer the door, I can see you."] This interaction was actually caught on video, which the reporting officer viewed. Mother did not immediately report this due to [Father's] intimidation.

Father eventually did file his custody complaint on June 8, 2023. Father sought shared legal and physical custody of [Child]. It was noted that he was presently living with [J.B.] and his roommate, Guy R. Jordan, Jr.

On June 26, 2023 an order . . . was entered granting [Father] partial custody of [Child] every other Friday at 3 p.m. until Sunday at 4 p.m.

On September 13, 2023 the parties entered into a consent order providing [Mother] with primary physical custody subject to [Father's] partial custody. Father was granted partial physical custody every other Friday at 3 p.m. until Monday at the start of school. At that point in time [Mother] did agree to withdraw that pending ICC against [Father] and the parties began using Our Family Wizard and began working with co-parenting counselor Kathy Firestine.

. . .

[The parties] entered into an interim custody order on December 20, 2023 which granted the parties shared legal custody and provided [Mother] with primary physical custody subject to his partial custody. Father was granted partial custody every Thursday at 3 p.m. until Monday at 9 a.m. or when [Child] attended school.

On January 29, 2024 [Father's] landlord filed their first landlord-tenant action against him for non-payment of his rent.

On February 29, 2024 [Mother's] counsel reached out to [Father's] counsel *via* correspondence noting that [Father] had missed three of the past scheduled co-parenting counseling sessions in direct contravention [of] the parties'

- 5 -

custody order. It should be noted that none of these absences were excused.

Father filed a motion for contempt on March 12 in an attempt to -- he listed it as preventing relocation at that time. Mother was interested in discussing a relocation to her parents' house. Nothing had happened. It was simply a request, and [Father] took that as her wanting to unilaterally move.

At the motions court hearing the parties consented to having [Mother] file a notice of proposed relocation to seek relief from [the trial court]. Subsequently [Mother] did file that notice of proposed relocation.

And just to summarize, [the parties] we did have that relocation [ ] conference at which point the parties consented to [Mother] moving within a 20-mile radius of [Father's] home.

A judicial conciliation was eventually held on March 26, 2024. Following the conciliation an order of court was entered that day expanding [Father's] custody to include Wednesday through Friday on the off week. Additionally this order indicated that [Father] and [Mother] could attend [Child's] upcoming dance recital on June 8, 2024. However, the order noted that both parents shall attend and sit on opposite sides of the room. And I would add emphasis to that phrase or sentence.

On May 17, 2024 [Mother's] counsel sent a letter to [Father's] counsel noting that [Father] had continuously used Our Family Wizard to send numerous repetitive condescending messages, and Kathy Firestine herself had indicated that [Father] had a bad habit of talking over both herself and [Mother] during their co-parenting sessions which led to unproductive sessions. Lastly, the letter did address [Father's] inappropriate or repetitive messages accusing [Mother] of abandoning [J.B.] . . .

On May 19, 2024 the parties met to exchange [Child's] items for . . . [Child's] upcoming dance photo shoot. Mother's partner was present during this exchange. Father arrived and did not bring all the necessary clothing for said photo shoot and an argument ensued. As a result, [Father] became

enraged and called [Mother] a fucking whore and fucking bitch and warned [Mother's] partner that she will cheat on you like she cheated on me all while in front of [Child] who was crying during [Father's] tirade.

Notably, [Father] violated the PFA Order for a third time prompting an ICC complaint on June 9, 2024.

On June 8 [Child] had her dance recital. . . . This was the subject of the indirect criminal contempt hearing which would later occur . . . on October 9, 2024. During this incident [Mother] was informed by [Child] that [J.B.] was left at home alone for two to three hours. [J.B.] has autism, and I believe it is severe autism. When [Father] returned to the recital or at that point in time a welfare check was called by [Mother]. Father had indicated that his reasoning for leaving [J.B.] behind was because [J.B.] had asked him and she had no problem with this. Mother pleaded with [Father] that he go get [J.B.] and bring her to the dance recital. He refused. She even offered to help with this. He refused. When that welfare check was called, [Father] then rushed back home to pick up [J.B.] and brought her back to the dance recital.

. . .

When [Mother] exited the auditorium for intermission she was immediately approached by [Father] in an aggressive and threatening manner. Father was acting erratic and irate at that time towards [Mother], which caused parents to intervene and separate the two.

Mother[, Child and J.B.] were brought into a nearby classroom to separate them from [Father] who was still acting in an aggressive manner. One of the parents called 911, stayed in the room with [Mother] and the children. She noticed [Father] glaring at her through the window of the closed door in a threatening manner as she was speaking to the 911 operator. Subsequently one of the teachers intervened and helped try to calm [Father] down and separate him from the situation. The teacher notified [Father] that the police were on their way. And instead of waiting for the police to arrive, that was the point in time [Father] rushed to his vehicle to escape. In his haste he left [J.B.] behind with [Mother], although [Mother] has no

- 7 -

custody rights over her whatsoever. Both children were under great stress and were crying.

Luckily while [Father] was entering his vehicle the police did arrive, and teachers as well as parents pointed him out as he was starting to drive away. A police chase ensued. He racked up a number of traffic violations, including speeding up to 60 miles per hour in a 35 [miles per hour zone] in a residential area. The first cop car had to terminate the pursuit in the interest of public safety. Subsequently another cop car began a second chase, and eventually he outran both cars and both police officers had to decide to stop their chase due to the danger that it was bringing to the public.

At that point in time [Father] was charged with eight offenses, including endangering welfare of children, fleeing or attempting to elude officer, harassment, disorderly conduct, stop sign, yield sign, duty to stop at a stop sign, duty of driver to approach -- of approach of an emergency vehicle and driving a vehicle at a safe speed.

At that point in time [Mother] filed a motion for contempt on June 11 for violating the custody order by directly confronting [Mother] rather than keeping his distance per the March 26, 2024 Order. Father was still on the run from the police at this time. It took approximately two weeks for [Father] to . . . voluntarily turn himself over to the police after direction from both Your Honor and his attorney at the time.

On June 18 this Honorable Court granted [Mother's] motion and noted that [Father] needed to strictly adhere to the custody order. That same day [Father's] landlord also filed an order for possession, so a second filing against [Father] initiating another landlord-tenant dispute, and an eviction hearing was scheduled. Father appealed that matter, which caused an eviction hearing to be continued.

On August 28, 2024 a support order was entered noting [Father] owed [Mother] over $6,000 in child support and that a contempt proceeding was initiated against [Father] with the contempt hearing scheduled for [October 3, 2024].

. . .

[Father] has continued to refuse to pay child support and ultimately he was ordered to get a W2 job to start . . . making those payments.

Father's counsel submitted her motion to withdraw around September 11, 2024.

On October 9, 2024 [Father] was found guilty of the ICC and was fined $750. The PFA was extended until August 18, 2028.

. . .

The moment that [Father's] counsel withdrew, it just started spiraling out of control. He began pestering [Mother] further in messages, emails, letters, filed numerous amounts of motions. Father did indicate to [Mother] *via* Our Family Wizard that these filings are, quote, unquote, "cathartic" to him and he enjoys submitting these excessive filings because it makes him feel good. And that's one of the exhibits we have here today.

Furthermore, [Father] has seemingly pestered almost every neutral third party in the case including, but not limited to, the parties' co-parenting counselor, Kathy Firestine, the Jefferson Hills Police Department, which I personally spoke to over the phone, [Mother's] crisis center representative, as well as her employer with the filing of misconduct complaints against [Mother] in an attempt to harass and essentially ruin her career, which is the only money that's coming in to support their child, as well as the judges in th[e] criminal and landlord-tenant cases by drafting and submitting numerous complaints, appeals and letters.

Following these numerous filings [Father] has been ordered to pay my firm by Your Honor approximately over $4,000 in attorney fees over the course of many orders. In one month he filed up to approximately twenty filings in a singular month. And we have yet to receive any payment from [Father] for any of these orders which he is in direct contempt and violation of. It is our understanding he has no intention whatsoever to make these payments. He is doing everything that he can to have [Mother] exhaust all her funds, and now

it is eating away at her parents' retirement funds as well. He is doing this completely out of spite.

Father has withheld phone calls from [Mother] for not apologizing for filing her PFA. Father has video-interrogated both [Child and J.B.] about the custody litigation in an attempt to use that to his favor. Father has a habit of waiting long periods of time to cooperate with [Mother] when she has issues of legal custody such as requesting help to request that a therapist . . . begin working with [Child].

I should clarify [Child] was diagnosed with ADHD. She does have outbursts at school at this time, and it is [Mother's] position it is due to these issues that are happening in the pending litigation as well as during their custody exchanges. And it was even noted by [Child's] school therapist. You can see in one of our exhibits it shows a chart, which I'll get to later, but essentially it appears that when [Child] is in [Father's] custody her ratings are brought down substantially, her feeling of safety, her respectfulness, all of those measurements go down and are correlated around those points in time.

And I would also add that he waited a full month to provide paperwork he needed to sign for [Child] to seek help. Same with medical decision-making. Mother has had to wait long periods of time to get his approval to be able to seek medical care.

. . .

There's many examples of her requesting that he respond so that they can seek help for [Child] and he purposely waits. And [Mother's] worried to do anything without his consent because without it he can use that against her.

Mother provides [Child] with a stable, loving, nurturing environment appropriate for [Child's] young age. Conversely, [Father] has displayed erratic, unstable and emotional behavior. Father clearly has a complete lack of care and disregard for [the trial court's orders] and law enforcement. He shows no intention of following any order or rule or law besides his own.

Father has left his daughter [J.B.] unsupervised for many hours and has admitted to [this] even at prior hearings that he'll go grocery shopping or things of that nature and leave his autistic 8-year old at home completely by herself. And we are unsure if this has been going on for a long period of time or recently, but he does do that. He's posted these video interrogations of [Child and J.B.] onto YouTube for purposes of custody litigation. We don't even know how many other recordings he's made that aren't posted. . . .

Mother is responsible for the daily needs of [Child]. She always has. Mother has a set routine with [Child] preparing her for school and to enjoy her weekends. She takes care of her medical, educational and psychological needs. And especially for her ADHD she does care for her in that regard. And the fact that [Mother] is a teacher herself tends to show that she has a lot of experience in helping raise young children and to help them thrive. We believe that that's also a huge benefit of her employment. Mother also spends time with [Child] socially and [Child] is safe in discussing anything with her.

With regard to extended family in the [] area close to where they live, there's maternal grandparents who are even here today. Mother also has a significant other, David, who they've been together for two years now. Father alternatively does not have extended family that [Child] spends time with. We don't believe [Child] is even aware of much of [Father's] family. And they do not have the same social or she does not have the same social life when in [Father's] custody compared to [Mother] in [Mother's] custody.

. . .

Mother avers that she and [Father] are rarely able to cooperate with one another. When there is cooperation it is highly likely it is because [Mother] has conceded and is trying to work with [Father]. Just examples before Your Honor. When we had the relocation conference, [Mother] did plead with [Father] to consent to an ICC – to waive – to essentially dismiss the ICC in lieu of continuing the PFA. He refused. Mother did not want to be here today and spend all the money it took to get here today for the trial, but [Father] uses that and dangles it over her head in an attempt to threaten her

and to harass her and to make her feel hopeless. The fact that he continues to file these appeals one after the other -- he has recently filed a tort claim against [Mother] that we've recently received documents for. It is just never ending. And he's weaponizing the court system in an attempt to break her down.

Mother avers that [Father] does struggle with severe mental health issues and debilitating anxiety, as noted in his self-reporting assessment. . . .

N.T. Hearing, 11/20/24, at 8-39.

Mother testified that the above summary accurately reflected her testimony. *Id.* at 39.

That day, the trial court entered its custody order in the matter. Of note, the trial court: granted Mother sole legal custody of Child; granted Mother primary physical custody of Child; and, granted Father partial physical custody of Child "if Mother deems advisable." Trial Court Order, 11/20/24, at 1-2. The trial court also enjoined Father from filing any petitions to modify the custody order until he paid the $4,250.00 he owed in outstanding counsel fees. *Id.* at 2. Father had been required to pay these counsel fees *via* three prior court orders – entered on September 25, 2024, October 23, 2024, and November 5, 2024 – sanctioning Father's frivolous court filings. *See id.*

Father filed a timely notice of appeal.[2]  He raises the following claims on appeal:[3]

> [1.] Did the trial court err on October 11, 2024, by denying [Father's] Petition to Modify the Final PFA Order pursuant to Pa.R.C.P. 1901.8(c) without granting a hearing, as required by 23 Pa.C.S.A. § 6117(c)?
>
> [2.] Did the trial court err in issuing two duplicative denials of [Father's] petition [to modify the PFA order]?
>
> [3.] Did the trial court improperly exercise jurisdiction after [Father] initiated appellate proceedings on September 26, 2024?
>
> [4.] Did the trial court err in enjoining [Father] from "contacting [Mother's] employer" based on false statements by opposing counsel, despite [Father's] statutory immunity under the Educator Discipline Act (24 P.S. § 2070.17a)?
>
> [5.] Did the trial court abuse its discretion in awarding counsel fees to [Mother] without making any findings as to the basis for the counsel fees, without identifying sanctionable conduct, and without determining [Father's] ability to pay?
>
> [6.] Did the trial court err by deeming or treating [Father] as having "waived" his right to participate at trial?

_____

[2] *See G.B. v. M.M.B.*, 670 A.2d 714 (Pa. Super. 1996) (a custody order is final and appealable after the trial court has concluded its hearings on a matter and the resultant order resolves the pending custody claims by the parties; such a decision as to finality supports the best interest of the child, judicial economy, and upholds the integrity of the trial court's process in deciding custody matters by avoiding piecemeal appeals that subject a child to uncertainties from such premature challenges).

[3] For ease of discussion, we have renumbered Father's claims.

[7.] Did the trial court err by awarding [Mother] sole legal and primary physical custody of [Child] without fully considering evidence critical to the child's best interests, including video evidence of [Mother's] use of corporal punishment against both J.B. and [Child]?

[8.] Did the trial court err by failing to give due weight to the significance of the relationship between J.B. and [Child], particularly in light of [Mother's] decision to sever ties with J.B. following her separation from [Father] in 2022, thereby undermining the premise that [Mother] is the parent more likely to encourage and support the relationships between J.B. and [Child], and between [Father and Child]?

[9.] Did the trial court abuse its discretion by radically altering the custodial *status quo* from 42.86% custody to *de facto* 0% custody for [Father] without adequately considering the impact on the child's best interests?

[10.] Did the trial court abuse its discretion in denying [Father's] Motion for Continuance, despite compelling evidence of financial hardship and lack of legal representation, thereby forcing [Father] to proceed *pro se*?

[11.] Did the trial court err in denying [Father's] Motion for Recusal?

Father's Brief at 8-10.

At the outset, Father's first two issues concern an order that is unrelated to the current, November 20, 2024, custody order on appeal. Specifically, Father claims that the trial court erred when it denied his petition to modify a PFA order. **See** Father's Brief at 64-70. These claims are not encompassed by the current appeal and, thus, Father can receive no relief on these claims.

Next, Father claims that the trial court erred when it "improperly exercise[d] jurisdiction after [Father] initiated appellate proceedings on September 26, 2024." Father's Brief at 34-40. We note that, on November

15, 2024, this Court quashed the appeal that Father filed on September 26, 2024, as the appeal was filed from a non-appealable, interlocutory order. **See** Order, 11/15/24, at 1. As such, Father's notice of appeal did not cause the trial court to lose jurisdiction over the matter. **See** Pa.R.A.P. 1701(b)(6) (declaring that, "[a]fter an appeal is taken," the trial court may "[p]roceed further in any matter in which a non-appealable interlocutory order has been entered, notwithstanding the filing of a notice of appeal").

Father's remaining claims were capably addressed in the December 23, 2024 opinion, authored by the able trial court judge, the Honorable Cathleen Bubash. Therefore, we affirm on the basis of Judge Bubash's opinion and adopt it as our own. In any future filing with this or any other court addressing this ruling, the filing party shall attach a copy of Judge Bubash's December 23, 2024 opinion.

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

7/3/2025

- 15 -

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

FAMILY DIVISION

C.D.,

          Plaintiff,

2024

          v.

C.B., Jr.

          Defendant

FD No. 22-001447-008

SUPERIOR CT NO: 1329 WDA

OPINION OF THE COURT

Honorable Cathleen Bubash
440 Ross Street, Suite 5036
Pittsburgh PA 15219

Copies to:

Counsel for Mother

Juan Paz-Rosario
jpazrosario@lynchlaw-group.com

C.B., Jr. (pro se)

cbloise242@gmail.com

FILED

2024 DEC 23 PH 2: 05

THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

FAMILY DIVISION

C.B., JR,

        Plaintiff,

                                     No. FD-22-001447-008

    vs.

C. D.,

        Defendant

## OPINION OF THE COURT

The Defendant, C. B., Jr. (hereinafter "Father") appeals from my November 20, 2024, Orders, one of which granted Mother sole legal and primary physical custody, allowing Father to have visitation as Mother agrees. A companion Order of the same date denies Father's request to "Discontinue". The Orders were entered after a trial on November 20, 2024, on Father's request for shared Custody and Contempt to which Father failed to appear. In the Concise Statement of Matters Complained of on Appeal filed with the Notice of Appeal, he raises 15 claims.[1] I will address them in the order in which they are presented in the Concise Statement.

At No. 2, Father contends that I erred by "Proceeding in violation of the Case Status." (See Notice of Appeal, P. 2, ¶ 2.) This claim is utterly frivolous. At 8:30 am on the morning of trial, Father emailed one of the Court email addresses what he captioned "Praecipe to Discontinue Without Prejudice, Preserving Rights and Conditions". It appears to have been filed at 9:10 am on the same day. He then did not show up at trial. He cited to Pa. R. Civ. P. 229 which addresses discontinuances in civil matters. This is a custody matter, not a civil matter. Pa. R. Civ. P. 1915.3-

---

[1] The Defendant failed to order the transcript when he filed the Notice of Appeal. After Court staff brought this to his attention, he submitted the transcript request, paid the required fee and the transcript was filed on or about December 12, 2024. Transmittal of the record has, therefore, been delayed.

2

1 specifically addresses the withdrawal of pleadings and Discontinuances in custody actions and states: "(2) the custody action may be discontinued by Praecipe only upon a verified statement of the moving party if the complaint has not been served." If the complaint has been served, as it was in this matter, a custody action can only be discontinued by leave of Court after notice to non-moving party or by the written agreement of the parties. Neither was present here. As Father did not have leave or Court or the agreement of the opposing party to discontinue the action, his Praecipe to Discontinue was a nullity and I did not err in denying his Discontinuance.

In his third and fourth claims "Failure to Consider the Best Interest of the Child" and "Radical Alteration of the Status Quo", Father essentially argues that I was wrong and that I had no evidence to arrive at my decision. I considered all evidence and testimony presented at the trial. Since Father chose to absent himself voluntarily from the trial, he offered no evidence and presented no testimony. Any claim that there was "other" evidence I should have considered is waived by Father's failure to participate in the trial.

I considered the evidence that was presented at the trial as well as the record history of the case and found that it was in the child's best interest that Mother have sole legal custody and primary physical custody. This decision included a consideration of the Custody Factors I am mandated to consider pursuant to 23 Pa. C.S.A. § 5323. The factor analysis was place on the record and can be found at pages 39 through 42 of the transcript. I need not repeat that analysis in its entirety here but will highlight the determinative factors.

As to Factor 1, which party is more likely to assure the safety of the child, this weighs heavily in Mother's favor. Father has behaved badly in front the child, which is harmful to her. He has had a PFA order entered against him and has been found in contempt. The conduct that led to the PFA order and the finding of contempt suggests an alarming lack of consideration of the best

3

interests of his daughter, the operative Court orders and the peace of other parents and children who were present at the dance recital. Although the abuse was not directed at the child, it took place in her presence. Father choice of leaving his other autistic 8 year-old daughter home alone to attend this daughter's dance recital leading to the incident in question was also concerning.

As to which parent is more likely to provide stability and continuity in the child's education and family life, this favors the Mother overwhelmingly. Mother has an extended family that interact with the child while Father and his other daughter are the only of his family members involved. Regarding education, the child has engaged in conduct at school most likely a result of the stress and trauma that Father has put her and Mother through. Mother has helped to shield her from the custody dispute while Father as sought to involve her.

This child is too young to have a well-reasoned preference. I found that Mother was more likely to maintain a loving, stable, consistent and nurturing relationship with the child and meet her emotional needs as well as her developmental needs and schooling and therapy. Mother has enrolled her in therapy and that has clearly helped her cope. In their totality, the factors clearly favored Mother having primary physical and sole legal custody. Most importantly. I found that Mother was most likely to ensure the safety of the child.

In his fifth claim, Father claims that in requiring that he pay the attorney fees awarded to Mother for Father's frivolous, dilatory and vexatious pleadings and requiring leave of Court before filing Motions, I imposed financially punitive and unreasonable conditions. I did not. Father has flooded this Court and Mother with frivolous motion after frivolous motion. He has filed frivolous appeals from my denial of some of his frivolous motions. His attempt to discontinue this action on the morning of trial is a glaring example of this conduct. His conduct has imposed a significant

4

financial burden on Mother, who is represented by counsel.[2] I could not allow him to continue to cause Mother to incur unnecessary attorney fees. Pursuant to 23 Pa. C.S.A., "...a court may award reasonable interim or final counsel fees, costs and expenses to a party if the court finds that the conduct of another party was obdurate, vexatious, repetitive or in bad faith. This section may not apply if that party engaged the judicial process in good faith to protect the child from harm." A pleading is vexatious "...if it is brought without legal or factual grounds and if the action served the sole purpose of causing annoyance. Dong Yuan Chen v. Saidi, 100 A.3d 587, Super.2014, reargument denied; A.L.-S. v. B.S., 117 A.3d 352, Super.2015, on subsequent appeal 161 A.3d 376, for text, see 2017 WL 571522. Father's counsel was granted leave to withdraw on September 2, 2024. Since then, he has filed at least 9 motions or petitions, and sought review in the appellate courts 5 times. Finally, after causing Mother to incur attorney fees in addressing all his Motions related to the custody trial, he then failed to appear at that trial, causing additional unnecessary fees to be incurred. I believed that assessing attorney fees was the only way to try to deter Father from continuing his conduct.

In claim 6, Father claims that I was biased against him because he was a *pro se* participant in the proceedings. He offers no examples of such bias; he just complains generally that my rulings favored Mother. It is impossible to address such a vague claim. An appellant is required to specifically identify the claim to be raised so that the appellate court knows what it will be addressing. Commonwealth v Dowling, 778 A.2d 183 (Pa. 2001). Simply saying that I was biased, without specifying which rulings demonstrate that, fails to meet this specificity requirement. Accordingly, Father's bias claim is waived.

---

[2] He has continued this harassment of Mother through litigation by filing an action in the Civil Division that involves many of the same claims and issues he has risen before me. *See Bloise v Dadey, GD24-01676.*

5

Next at claim 7, Father claims I entered "legally flawed orders" prohibiting him from contacting Mother's employer. As part of the PFA Order, I did indeed prohibit Father from harassing Mother at work by contacting her employer. Such a prohibition is entirely appropriate in a PFA order. He claims, however, that this conflicts with the immunity provisions of the Educator Discipline Act found at 24 P.S. 2070.17a which provides immunity from civil liability to anyone "...filing a complaint or a report or for providing information to or cooperating with the department or the commission in the course of an investigation or proceeding conducted under this act." Father was not prohibited from filing a complaint with the Department of Education; he was prohibited from contacting Mother's employer. He was not prohibited from providing information in the course of any proceeding conducted under the Act. There were no proceedings ongoing. This claim is frivolous on its face.

Father's complaint in 6 is that I erred in denying his Motion to Continue the custody trial is without merit. He had ample time to prepare or the trial which had already been continued several times. Moreover, in that he failed to appear for the trial, any claim regarding the denial of a continuance is waived.

In his next two claims, eight and nine, he argues that the Court erred in denying his Petition to Modify Final PFA Order without first holding a hearing and in issuing duplicate orders. Father sought to modify the PFA Order in his request to terminate it early. He provided no legal basis for me to do so or explained why he was entitled to such a modification. 23 Pa. C.S.A. § 1901.8 c provides: "If either party seeks a modification after a final judgment has been entered in a protection from abuse action, the party shall petition the court to modify the final order. The court shall enter an order granting or denying the petition following an appearance by the petitioner before the court." The PFA statute, 23 Pa. C.S.A. 6117, does not mandate a hearing. It states that

6

a party may seek modification that may be ordered upon the filing of a Petition for modification, service of that petition and a hearing on the petition. While a Court may only grant the modification after a hearing, where the request is utterly frivolous, a hearing is not necesarry.

Further, Father never filed an appeal from the order denying his request that the PFA order be terminated. The time in which to do so has passed. The PFA proceeding is a separate proceeding from the custody action. The Order denying the Modification request would be a final order in the PFA matter from which an appeal could have been taken. As it was not, the claims related to the PFA are waived.

Father also contends that I imposed counsel fees without making the necesarry findings to support my conclusion that he was submitting frivolous and dilatory pleadings. I made appropriate findings. It was not necesarry that I review every instance of vexatious conduct. The record itself speaks to the frequency of his presentation of frivolous motions and petitions intended to harass and annoy Mother and cause her to continue to incur, needlessly, significant attorney fees.

Father next contends that I erred by holding a hearing on October 23, 2024, in which I addressed, among other things, his request that the PFA order be modified. Father noticed the other party that he would be presenting several motions at my regularly scheduled motions court. He did not, however, appear at Motions Court. Father's failure to appear at a hearing he gave notice for is the epitome of being vexations and dilatory.

Again, father claims I was biased and should have recused. Once again, he has not explained with any specificity how I demonstrated such bias. Accordingly, this claim is waived.

Finally, Father complains that I erred in denying his Motion for Special Relief in which he sought to amend his custody complaint. Defendant's failure to appear at the trial effects a waiver

7

of this claim. Father cannot argue that I did not address issue that were never presented because he did not participate in the trial.

For the reasons set forth above, the judgment of this Court should be affirmed.

BY THE COURT:

*Cathleen Bubash*